## Case No. 37.

### The ACTOR.

[Blatchf. Pr. Cas. 215.][1]

District Court, S. D. New York. Sept. 1862.

PRIZE—VIOLATION OF BLOCKADE.

Cargo condemned, on further proof, for a violation of blockade by the vessel.

In admiralty.

## Case No. 38.

### The ADA.

[2 Ware, (Dav. 407,) 408.][1]

District Court, D. Maine. Sept. 12, 1849.

ADMIRALTY JURISDICTION — SHIPPING ARTICLES— CONSTRUCTION — SEAMEN'S WAGES — FORFEITURES.

1. In suits in rem, the locus rei sitae gives the jurisdiction for it is only in the courts of that country that a jus in re can be directly enforced.

[See The Bee, Case No. 1,219.]

2. Every contract is binding on the parties in the sense in which it is mutually understood by them at the time when it was made.

3. The meaning of the contracting parties is generally to be collected from the words in which the contract is expressed. But when the language is ambiguous, or the words have a popular sense more or less extensive than that which they naturally import, we may look beyond the words to ascertain the intent of the parties.

4. When the meaning of the language is obscure or uncertain, the construction is to be against the party in whose words it is expressed. This general rule of interpretation applies in all its force, against the owners, in the construction of shipping articles.

5. When, in the shipping articles of an English vessel, the voyage was described to be from Liverpool to Savannah, and any port or ports of the United States, of the West Indies, and of British North America, the term of service not to exceed twelve months, it was held, that the voyage intended was confined to the ports on the eastern shore of the continent, and that

[1][Reported by Samuel Blatchford, Esq.]                    [1][Reported by Edward H. Daveis, Esq.]

the articles did not authorize a voyage to San Francisco, on the north-west coast.

[6. Where, by reason of a vessel being short-handed, and the seamen refuse to proceed on the voyage, their subsequent consent to do so is a sufficient consideration for the release by the master of claims for deductions from their wages of fines, imposed on them at a port for breaches of the peace and paid by him.]

[7. Under St. 7 & 8 Vict. c. 112, § 7, providing that no forfeiture of seamen's wages for willful absence from the ship shall be incurred unless the fact of the seaman's absence shall be entered on the ship's log book, claims for wages cannot be reduced by forfeitures for absences which, though admitted by the seaman, were not noted in the ship's log to show that the master regarded them as willful.]

[In admiralty. Libel by William Reynolds and others against the ship Ada for wages. Decree for libelants.]

This was a libel for wages, and was heard on the following statement of facts, agreed by the parties:

'The libellants shipped on board the barque at Liverpool, according to the shipping articles, which are to be exhibited to the judge at the hearing. From Liverpool the ship came to the port of Savannah, where she arrived about the 20th of May. She lay there about ten days, and discharged her cargo. She then ran in ballast to Calais, Maine, where she arrived about the 20th of June. She discharged ballast immediately, and in the course of three or four weeks began to fit up on her present voyage. The libellants asked their discharge of the master several times after they ascertained the destination of the ship. The first time was about three weeks prior to the commencement of their proceedings before the magistrate. They also, through their proctor, F. A. Pike, made a demand, about a week before commencement of proceedings, upon the master for their discharge, and for their wages. In asking for a discharge, the reason given was, that they did not wish to go to California, two of the men (Reynolds and Clanahan) stating in addition that they wished to go back to Liverpool as their clothes were there. The crew was not furnished with lime-juice on their passage from Savannah to Calais, although they asked it of the steward, who said there was none for them. No complaint was made to the master on this account. The ship is now loaded for California, and has engaged fifteen or twenty passengers for that destination, but intends going to St. Andrews, in the province of New Brunswick, first, for the purpose of clearing out for San Francisco. The first mate was discharged in Savannah; the second mate was discharged in Calais about the 10th of August. Reynolds was absent three times from the vessel without leave; the first time, he was gone about an hour during dinner; second time, absent from eleven o'clock till evening; the third time, was absent about thirty-six hours to Eastport, to see the British consul about

this matter. Hughes was absent with Reynolds from eleven o'clock till evening, and again at the time Reynolds went to Eastport. Clanahan was absent the same as Hughes. Miller was absent with the others from eleven till evening, and again about two hours. After each of the above times —e men returned to the vessel and went to work as usual. The vessel had been coppered and an extra passenger-house built upon deck, and two of the men had asked their discharge, before any of the above absences. They remained on board the ship doing duty as usual, until the day of trial before the magistrate, when they refused to go on board, and have not since been on board.

'The respondent claims a forfeiture, of the several libellants, for absence without leave from the vessel as aforesaid, under the provision of the shipping articles as follows:

William Reynolds, three times absent, £6.
Hugh Clanahan, twice " £4.
Robert Hughes, " " £4.
John Miller, " " £4.

The accounts annexed against the libellants are correct, except that they claim that the charge against each of them for amounts paid in Savannah for fines, for breach of the peace, should be deducted; for this reason, after the master paid the fines, three men and two boys left the ship, and, on account of his being short handed, these men refused to get the ship under way and go to sea, and to induce them to do so the captain promised to remit those charges, and the men came with the vessel, short handed, to Calais.'

(Signed) F. A. Pike, Proctor for Libellants.
George M. Chase, for Respondents.

Deblois, for libellants.
W. P. Fessenden, for respondents.

WARE, District Judge. This is a suit on a foreign contract, in which all the parties are foreigners, and is to be governed by the laws of the country where it was made, and to which the parties belong. The libellants proceeding on their lien against the ship herself, and that being within the jurisdiction of this court, whatever scruples may be entertained by courts of admiralty in other countries, there is no doubt according to the decisions of our courts, and in my opinion there is none on general principles, that this court, notwithstanding the alienage of the parties, may take cognizance of the case, and enforce the lien, if by law the libellants are entitled to it. Conk. Pr. Adm., pp. 24–37. The Jerusalem, [Case No. 7,293;] The Bee, [Id. 1,219.] In suits in rem, the locus rei sitae necessarily gives the jurisdiction, because it is only in the courts of that country that a jus in re can be directly enforced, though in foreign contracts the law of the place, where the contract was made, furnishes the rule of decision. The libellants shipped at Liver-

pool, April 4th, 1849, for a voyage, which is described in the shipping articles to be from the port of Liverpool 'to Savannah, and any other port or ports in the United States of America, and any port or ports in British North America, and any port or ports in the West India Islands, at the discretion of the master, or consignees, as freight or cargo may offer, and back to her final port of discharge, of Great Britain and Ireland; term of time on the voyage not to exceed twelve months. The vessel's complement of officers, seamen, and apprentices, eleven in number, and any over or above the number of said complement to be considered as extra hands.' The vessel performed her voyage to Savannah, and having discharged her cargo there, went in ballast to Calais. There the libellants, having learned that the master was preparing for a voyage to San Francisco, in California, refused to go on that voyage, and demanded their discharge and wages. Four and a half of the twelve months, to which the time of service was limited, had then expired.

The master contends that the refusal of the libellants to proceed on that voyage was a breach of their duty, by which they have forfeited all right to the wages they had earned for their past services. The libellants, on the other hand, say that this new voyage to California was a deviation from that originally contemplated and for which they engaged themselves, and amounted to a breach and dissolution of the contract, and released them from its obligations; that they might, therefore, well demand their discharge, and to be paid their wages, for the time they had served.

The right of the libellants to their discharge, and to be paid their wages, has been ably vindicated by their counsel on several grounds; but they may perhaps all substantially be resolved into one, at least in the view that I take of the case, it will be necessary for me to consider only one, and that is this, admitting, what is denied by the counsel, that San Francisco is properly a port of the United States, not having been made such by any laws, whether it can in any just sense be deemed to be one of the ports contemplated by this contract. Every contract is morally binding on the parties in the sense in which it is understood by them at the time when it is made; and it is to the same extent, and no further, binding on them in law, when this sense can be clearly ascertained. 'Whatever,' says Paley, 'is expected on one side, and is known to be so expected on the other, is to be deemed a part or condition of the contract.' Moral Philosophy, bk. 3, pt. 1, c. 6. This proposition I hold to be as sound in law as it is in morals. All the rules for the interpretation of contracts have for their object to ascertain what this common understanding of the parties is, and when it is discovered,

the law comes forward and applies itself to their mutual and common intention, and holds the parties bound by their agreement thus far and no farther. It is commonly said that the intention of the parties is to be collected from the words in which the contract is expressed. This, as a general proposition, is perfectly true; but it is not universally true that we are to look at the words alone. The greatest of the Roman jurisconsults has told us that, In conventionibus contrahentium voluntatem, potius quam verba, spectari placuit. Dig. 50, 16, 219; Papinianus, Lib. 2, Responsorum. It is the intention that is sought. The language may be ambiguous and susceptible of two interpretations; or it may have a popular sense, in local usage, or in its application to the subject-matter of the particular contract, more or less comprehensive than the words naturally import when taken by themselves. In these cases we are obliged to look beyond the words. Now I think that the case before us is one to which the latter distinction may apply. Within the words of the description of this voyage, the master might carry his crew to any port in British North America. But the British possessions extend across the whole breadth of the continent, and without going beyond the literal sense of the language of the contract, he might carry them on a voyage to the extreme north-west coast. Can it be imagined that the owners, when they prepared this shipping paper to be read to the crew, supposed, unless some verbal explanations were given at the time, that the men would understand that they were binding themselves to go a voyage to the mouth of the Columbia river, or to Vancouver's island, if the master chose to carry them there. The description would naturally suggest to them a voyage to those ports which were familiar to the commerce of their country, and which were frequently and ordinarily visited for the purposes of trade, and in the popular and usual sense, they would suggest nothing more. That is, it would be taken to be a voyage in which the vessel might visit any of the American or British ports on the eastern shore of the continent. This is the interpretation that I should have given to the contract, if the description of the voyage had terminated with merely naming the ports which might be visited, in the order in which they stand in the shipping articles. They would, without some further explanations were given, suggest to the seamen a voyage embracing the ports on the eastern shore of the continent and nothing more. It was justly urged, by the counsel for the libellants, that, if there is a fair and reasonable doubt as to the true meaning of the articles, the seamen are on every principle entitled to claim a construction favorable to themselves. It is the owners who give the description of the voyage, and on general principles applying to all contracts, if the language is ambiguous or

uncertain in its meaning, the construction shall be against the party who uses it, because he is bound to express himself clearly, and this principle applies with all its force to contracts between owners, who are always men conversant in business and shrewd and watchful in looking to their own interests, and seamen, who are proverbially careless, improvident, and ignorant. The disparity in the condition of the parties imposes on the court the duty to take care that the improvidence of seamen is not entrapped, by the superior watchfulness and sagacity of owners, into engagements that they did not intend to make.

In the present case, this construction of the contract is forfeited by another clause in the articles, which appears to me to be entirely decisive. It is the limitation of time. The whole period of the service was not to exceed twelve months. The first port the vessel was to make was Savannah, and if a voyage around Cape Horn to the northwestern coast of the continent had been contemplated, it is incredible that the time should have been limited to twelve months. The decisions of the high court of admiralty in England, referred to in the argument, though not in cases precisely parallel in their facts with those of the present case, bear considerable analogy to them, and from the tone and language in which they were pronounced, I cannot entertain a doubt that an English court would hold, that the voyage to San Francisco was such a deviation from the voyage contemplated by the shipping articles, as to discharge the seamen from their contract; that the voyage was broken up as to them, and that they are entitled to their wages. The Countess of Harcourt, 1 Hagg. [Adm.] 248. The Minerva, Id. 347. The George Home, Id. 370. The Cambridge, 2 Hagg. [Adm.] 243. If wages are decreed, the master contends that there are equitable deductions to be made from the amount due; in the first place, certain sums which he paid for the libellants in Savannah, for fines imposed on them by the local authorities of that place, for breaches of the peace. The payment of these sums is admitted, and it is not denied that they constitute an equitable set-off against their wages, unless the claim of the master has, for a valid consideration, been released, and in my opinion it has. When the vessel was ready to be got under way to leave Savannah, she was found to be short-handed, three of the men, and two of the boys having deserted. The vessel's complement was eleven hands, including the officers, so that she had but barely more than half her complement left. In this state of things, the crew refused to proceed on the voyage, and to induce them to forego their determination, the master promised to release this claim against them. I should not be inclined to hold the master bound by

this engagement, if it had been extorted from him under the pressure of necessity, without any reasonable or colorable pretext. But this can hardly be considered as a mere wanton refusal to do their duty, on the part of the crew. Whether, on the requirement of the master, they might have been bound to proceed on the voyage, with half a crew, being then in a port where additional hands might be obtained, I do not think it necessary to decide. By going with half their complement of men, they subjected themselves to do double duty, and if the weather should prove boisterous, to increased danger, and at the same time relieved the owners from the expense of nearly half the ordinary crew. My opinion is that their consent thus to proceed on the voyage, under the circumstances, was a sufficient consideration to uphold this release. The master also claims a deduction of the amount of certain forfeitures, alleged to have been incurred by the libellants. These, if any have been actually incurred, arise under St. 7 & 8 Vict. c. 112, § 7, (Sept. 5, 1844), not for desertion, as they seem to be considered by the master, but for temporary absence without leave. This statute provides that a seaman shall forfeit, for every willful absence from the ship, without leave, or refusal to do his duty, two days' pay, and for every twenty-four hours' absence six days' pay, or, at the option of the master, the expenses necessarily incurred in hiring a substitute; provided always, that no forfeiture shall be incurred, unless the fact of the seaman's absence, or neglect, or refusal to do his duty shall be entered on the ship's log-book. These absences were for short periods, the longest but half a day, except one of thirty-six hours for the purpose of consulting the British consul on the subject of this deviation from the original voyage. This was a very proper and prudent act on their part, and could in no sense be called a willful absence. But, with respect to all of them, there is this fatal defect in the evidence. It is not mentioned, in the agreed statement of facts, that the absences were noted in the ship's log. The admission of the absences, in the statement of facts, is not sufficient to cure this defect. This entry is not required merely as a medium of proof, but for the purpose of showing that it was regarded, at the time, as a criminal act on the part of the seamen, and to prevent the master, on any subsequent difficulty with the seamen, from bringing forward past absences, and creating forfeitures, when, at the time, they were considered, if not entirely venial, as not deserving to be punished by statute forfeitures. Decree for libellants.